**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC and SONY MUSIC ENTERTAINMENT,<br><br>Movant,<br><br>vs.<br><br>KID DISTRO HOLDINGS, LLC d/b/a DISTROKID,<br><br>Third Party. | Case No.: 1:26-mc-510<br><br>[RELATED TO CASE NO. 1:24-cv-11611 PENDING IN THE DISTRICT OF MASSACHUSETTS] |
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC and SONY MUSIC ENTERTAINMENT,<br><br>Plaintiffs,<br><br>vs.<br><br>SUNO, INC. and JOHN DOES 1-10,<br><br>Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL KID DISTRO HOLDINGS, LLC d/b/a DISTROKID'S COMPLIANCE WITH A NON-PARTY SUBPOENA**

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. The Underlying Lawsuit ..... 2

B. DistroKid's Outsized Role in Distributing AI-Generated Music to Digital Services ..... 3

C. The Subpoena and DistroKid's Refusal To Produce Information About Its AI-Detection Tool ..... 6

D. Plaintiffs' Narrowed Requests ..... 7

III. LEGAL STANDARD ..... 8

IV. ARGUMENT ..... 9

A. The Narrowed Requests Seek Information Directly Relevant to Suno's Fair Use Defense ..... 9

1. The Market Effect of AI-Generated Outputs Is Central to the Fourth Fair Use Factor ..... 9

2. DistroKid's AI-Detection Data is Direct Evidence of Market Impact ..... 11

3. DistroKid's Relevance Objections Mischaracterize the Underlying Action ..... 12

B. The Probalistic Nature and Third-Party Origins of DistroKid's AI-Generation Tool Are Not Grounds to Withhold the Results ..... 14

C. The Protective Order Addresses DistroKid's Confidentiality Concerns ..... 15

D. DistroKid's Remaining Objections Lack Merit ..... 16

V. CONCLUSION ..... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 12

*BLST Northstar, LLC v. Atalaya Cap. Mgmt. LP*,
2024 WL 2279195 (S.D.N.Y. Mar. 12, 2024) .......... 18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 13, 16

*Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*,
269 F. Supp. 3d 124 (S.D.N.Y. 2017) .......... 11, 12

*DoorDash, Inc. v. City of New York*,
754 F. Supp. 3d 556 (S.D.N.Y. 2024) .......... 11, 12, 19

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... 13, 14

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 12

*In re NTL, Inc. Sec. Litig.*,
244 F.R.D. 179 (S.D.N.Y. 2007) .......... 17

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 13, 16

*Local 3621, EMS Officers Union v. City of New York*,
2024 WL 1856302 (S.D.N.Y. Apr. 26, 2024) .......... 20

*Malibu Media, LLC v. Doe*,
2016 WL 5478433 (S.D.N.Y. Sept. 29, 2016) .......... 11

*Max Impact, LLC v. Sherwood Grp., Inc.*,
2014 WL 902649 (S.D.N.Y. Mar. 7, 2014) .......... 17

*N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*,
325 F.R.D. 36 (E.D.N.Y. 2018) .......... 20

*Samsung Elecs. Co. v. Microchip Tech. Inc.*,
2024 WL 3907250 (S.D.N.Y. Aug. 23, 2024) .......... 12

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026) ....................................................... 13

*Tiffany (NJ) LLC v. Qi Andrew*,
276 F.R.D. 143 (S.D.N.Y. 2011) ............................................................................................. 18

*Universitas Educ., LLC v. Nova Grp., Inc.*,
2013 WL 57892 (S.D.N.Y. Jan. 4, 2013) ................................................................................. 18

**Statutes**

17 U.S.C. § 107(4) ............................................................................................................ 12, 16

17 U.S.C. § 1201(a) .................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 26 ............................................................................................... 11, 15, 16, 17

Fed. R. Civ. P. 37 ....................................................................................................................... 2

Fed. R. Civ. P.45 .................................................................................................................. 2, 11

Pursuant to Rules 37 and 45 of the Federal Rules of Civil Procedure, Plaintiffs respectfully move to compel non-party Kid Distro Holdings, LLC d/b/a DistroKid ("DistroKid") to comply with a subpoena issued pursuant to Rule 45 (the "Subpoena"), which seeks the production of documents relevant to central issues in Plaintiffs' underlying copyright infringement action against Suno, Inc., a generative AI service that produces digital music files based on user prompts.

## I. INTRODUCTION

DistroKid is a digital music distributor. Users upload recordings to DistroKid, and DistroKid delivers those accepted recordings to various music streaming services and digital platforms such as Spotify, Apple Music, and TikTok, and generally passes the resulting royalties back to the uploader. By its own account, DistroKid presently distributes roughly 40% of all new music in the world. As generative AI services have made it possible to generate digital audio files on a large scale in seconds, Distrokid's distribution service has become the principal route by which AI-generated recordings reach the streaming market. And publicly available evidence suggests that most of those AI-generated outputs, and an increasing share of them, come from Suno, Inc. ("Suno"), the defendant in the underlying copyright infringement action.

The scale is staggering, with one estimate indicating that between March and September 2026, DistroKid distributed nearly *12 million tracks* to a single major digital service, comprising more than half of all tracks delivered to that service and exceeding deliveries from all other distributors combined. That growth coincides with the rise of generative AI, and DistroKid does not dispute that it sits in the middle of this machine-fueled surge. To the contrary, DistroKid has admitted that it has measured the surge using a third-party AI-detection tool. That makes DistroKid a singular source of relevant evidence. Suno, by contrast, does not track where its outputs are distributed once they leave Suno's platform. Therefore, the question of how much AI-generated music is reaching digital platforms, and what it is earning there, is not information that is available from Suno in party discovery.

In the underlying action, pending in the District of Massachusetts, Plaintiffs allege that Suno copied their copyrighted sound recordings without authorization to train its generative AI

music models. Suno's principal defense is fair use, which requires the court to consider what unrestricted and widespread conduct like Suno's would do to the market for Plaintiffs' recordings. Plaintiffs have alleged from the outset that Suno's industrial-scale theft will lead to a market flooded with machine-generated recordings that compete with human-created works and, among other things, dilute the royalties they earn. DistroKid's AI-detection results are direct evidence of that flood. Because DistroKid sits upstream of the streaming services, its data captures AI-generated recordings at the point of entry into the supply chain and broader consumer market.

This motion asks for very little. Under the third-party subpoena Plaintiffs served on DistroKid, Plaintiffs seek documents sufficient to show (1) monthly aggregate counts of the recordings DistroKid delivered, tested with its AI-detection tool, and scored as likely AI-generated, together with their streams and royalties, and (2) the tool's name and vendor, when DistroKid adopted it, whether it attributes recordings to a particular AI service, and what DistroKid knows about its accuracy. Much of what this motion seeks is data that DistroKid's own tool has already generated and facts DistroKid has already partially disclosed, all of which would be produced under the operative protective order in the underlying action.

DistroKid nonetheless refuses to produce a single document about the AI-detection tool, resting on objections that recast the underlying action as exclusively implicating how Suno trained its generative AI models, without regard to Suno's fair use defense and the related market impact analysis. Because the narrowed requests seek highly relevant information that only DistroKid possesses and are proportional to a case in which the market effect of AI-generated music is a central contested question, the Court should compel production.

## II. BACKGROUND

### A. The Underlying Lawsuit

Plaintiffs are record companies that own or exclusively control copyrights in many of the most commercially valuable sound recordings in the world. First Am. Compl., *UMG Recordings, Inc. v. Suno, Inc.* (the "Underlying Action"), No. 24-cv-11611-FDS (D. Mass), Dkt. No. 277, ¶¶ 6, 17. Suno operates a generative AI service that generates digital audio files in response to a user's

text prompt. *Id.* ¶¶ 7, 31. Its paid tiers permit users to generate thousands of audio files per day and to exploit them commercially, including through major streaming services that also make Plaintiffs' recordings available to consumers. *Id.* ¶ 32. In the underlying action, filed in June 2024, Plaintiffs allege that Suno built that service by copying their recordings at massive scale to train its AI models, in part by "stream ripping" them from YouTube. *Id.* ¶¶ 37–38, 45–52. Plaintiffs assert claims for copyright infringement and for circumvention of technological protection measures under 17 U.S.C. § 1201(a). *Id.* ¶¶ 84–106. Fact discovery is ongoing, and disputes concerning third-party discovery must be raised by October 14, 2026. Underlying Action, Dkt. 284.

Suno's principal defense is fair use. Plaintiffs have alleged from the outset that Suno's outputs are themselves a significant source of market harm. This is because those AI-generated outputs are "finding their way onto the major streaming services," where they "compete with the copyrighted sound recordings that enabled their creation" and "compete for plays against real, copyrighted sound recordings." First Am. Compl. ¶¶ 12, 79; *see also id.* ¶¶ 14, 74. Additionally, the sheer "speed and scale" of Suno's output "risks overrunning the market with AI-generated music and generally devaluing and substituting for human-created work," *id.* ¶ 12. Accordingly, the extent to which AI-generated recordings have reached and impacted the streaming market and the resulting harm to human-created recordings are central contested questions in the underlying action.

### B. DistroKid's Outsized Role in Distributing AI-Generated Music to Digital Services

DistroKid describes itself as "an independent digital music distribution service that delivers finished recordings, uploaded by its users, to digital service providers." Ex. C at 3.[1] Its users upload recordings, which DistroKid then delivers to various digital service providers, with Spotify, Apple Music, TikTok, being among DistroKid's partners. DistroKid then collects royalties generated

[1] Unless otherwise specified, all citations to exhibits refer to the documents appended to the Declaration of Alexander R. Perry in Support of Plaintiffs' Motion to Compel Kid Distro Holdings, LLC ("Perry Decl.").

from the recordings on digital services and remits payments to its users.[2] DistroKid claims to be the largest distributor of new music in the world, delivering "roughly 40% of all new music" for more than four million artists.[3] In 2021, it reported ingesting 35,000 new tracks a day, more than a million a month.[4] It now claims a distributed catalog of more than 45 million songs. *See* Ingham, *supra* note 3. According to data cited in a recently filed lawsuit brought by Universal Music Group against DistroKid, between March and September 2026 DistroKid delivered nearly twelve million tracks to a single major digital service, comprising more than half of all tracks delivered to that service in that period and exceeding deliveries from all other distributors combined.[5]

DistroKid is one of the primary conduits by which the streaming market is being flooded with AI-generated recordings. Deezer, one of the world's largest streaming services and the first to deploy AI-detection technology across its service, reported in July 2026 that it is now receiving "approximately 90,000 fully AI-generated tracks every day," and that such tracks "exceeded half of all daily new music deliveries" at peak in June 2026.[6] DistroKid accepts AI-generated recordings for distribution. Its published policy, titled "Can I Upload Music Made With AI Tools to DistroKid?," answers yes, subject to four basic "rules."[7] DistroKid did not offer uploaders the option to disclose their use of AI until April 2026, and did not roll out that feature to all users until

---

[2] *See* Distrokid, *What is Distrokid?*, *available at* https://support.distrokid.com/hc/en-us/articles/360013535454-What-is-DistroKid.

[3] Tim Ingham, *DistroKid, Distributing 'Roughly 40%' of All New Music, Hasn't Yet Signed IFPI's New Anti-Fraud Standards . . . Unlike CD Baby*, Music Bus. Worldwide (Sept. 14, 2026), *available at* https://www.musicbusinessworldwide.com/distrokid-new-anti-fraud-standards-unlike-cd-baby/.

[4] Murray Stassen, *Distrokid is Now Distributing Over a Million New Tracks Every Month*, Music Bus. Worldwide (May 10, 2021), *available at* https://www.musicbusinessworldwide.com/distrokid-is-now-distributing-over-a-million-new-tracks-every-month/.

[5] Complaint, *UMG Recordings, Inc. v. DistroKid, LLC* ("DistroKid Action"), No. 26-cv-01156-MN, Dkt. No. 1 at ¶ 60 (D. Del., filed September 15, 2026).

[6] Deezer, *AI Music Has Surpassed 50% of New Music Uploads for the First Time* (July 21, 2026), *available at* https://newsroom-deezer.com/2026/07/ai-music-exceeds-50-percent-daily-uploads-deezer/.

[7] DistroKid, *Can I Upload Music Made With AI Tools to DistroKid?*, *available at* https://support.distrokid.com/hc/en-us/articles/41182362733715-Can-I-Upload-Music-Made-With-AI-Tools-to-DistroKid.

June 2026. Ex. C at 11.[8] Even now, the disclosure is voluntary and self-reported. As DistroKid has explained, users "may" acknowledge the use of AI when uploading and DistroKid "takes [those acknowledgments] at face value," because it supposedly "is not in a position to verify the accuracy or completeness" of them. *Id.* at 11, 17. The publicly available evidence indicates that a substantial share of what DistroKid distributes is AI-generated, and that most of that content was made with Suno. For instance, the Sonic Intelligence Academy ("SIQA"), an organization that operates charts for AI-generated music, reported that Suno was used in 90.4% of the 1,551 tracks submitted to its charts in the first quarter of 2026 and in 92.8% of the 1,743 tracks submitted between April and August 2026, a "market position that makes understanding Suno's output synonymous with understanding AI music itself."[9] Among submissions reporting a distributor, DistroKid's share rose over the same period from 75.8% to 77.6%, roughly "3 in 4 distribution relationships." Exs. D & E. SIQA observed that DistroKid's "dominance" in the AI music distribution landscape "is not eroding. It is growing." Ex. E. SIQA attributes that share to DistroKid's "openness" as "a platform that has not closed its doors to AI-generated or AI-assisted music," and reports "[t]he overwhelming majority" of AI uploaders "are actively distributing their music commercially on every major DSP right now." Exs. D & E.

DistroKid is aware of the AI-generated content on its platform and has tools to measure it. In response to Plaintiffs' subpoena, DistroKid disclosed that, apart from the recently implemented user-disclosure feature, it "has access to a prediction model built by a third party, which assigns probabilities to content uploaded to DistroKid regarding the use or non-use of AI." Ex. C at 11–12. DistroKid has nonetheless refused to produce any data generated by that tool or any information about it, as described below.

---

[8] *See also* Ashley King, *DistroKid Is Now Asking Creators If Their Music Is AI-Generated as 'Self-Disclosure' Strategy Moves Out of Beta*, Digital Music News (May 14, 2026), *available at* https://www.digitalmusicnews.com/2026/05/14/distrokid-ai-credit-disclosure-what-it-looks-like/.

[9] Sonic Intelligence Acad., *The SIQA AI Music Intelligence Report (Q1 2026)*, *available at* https://report.thesiqa.com/ ("Q1 Report"); Sonic Intelligence Acad., *The SIQA AI Music Intelligence Report (Mid-Year 2026)* ("Mid-Year Report"). SIQA's tool and distributor figures are self-reported by the users who submit content to SIQA's charts. The data for the Q1 Report is from January 30 through March 31, 2026, and the data from the Mid-Year report is from April 1 through August 20, 2026.

### C. The Subpoena and DistroKid's Refusal To Produce Information About Its AI-Detection Tool

Plaintiffs served the Subpoena on DistroKid on September 10, 2026, with a return date of September 24. Ex. A. On September 22, DistroKid's counsel requested an extension to October 16. Ex. F at 4–5. Because the issuing court had set October 14, 2026 as the deadline to raise third-party discovery disputes, Plaintiffs offered a shorter extension conditioned on DistroKid's providing "substantive response to the served requests and a concrete production offer." *Id.* at 4. DistroKid responded that it "intend[ed] to raise objections to the subpoenas but also intend[ed] to provide responses and documents," and proposed serving "initial responses/objections" on September 25 followed by a conference on October 1 at which it would "be in a position to talk about production substance and timelines." *Id*. at 3. Plaintiffs agreed. *Id.*

In its September 25 responses, DistroKid objected "to the Subpoena in its entirety" and, as to each of the seventeen requests, stated that it "will not produce documents." Ex. B at 2, 10–26. The responses characterized the underlying action as "relating to how Defendant Suno, Inc. . . . built and trained its artificial-intelligence models" and asserted that information about AI-generated content distributed through DistroKid "has no bearing" on that question. *Id.* at 1, 14.

The parties met and conferred by videoconference on October 1 and October 7, 2026. Perry Decl. ¶ 11. On October 6, in light of the October 14 deadline, Plaintiffs asked DistroKid to state its final positions. Ex. F at 1. DistroKid served supplemental responses and a limited production on October 9, describing them as addressing "the specific requests that were highlighted, clarified and refined during our discussions" and stating that it "believe[d] these fully address the outstanding issues[.]" Ex. G at 2; Ex. C. The production consisted of three aggregate figures: the number of recordings uploaded to DistroKid in each year from 2021 through 2026, the number of recordings DistroKid delivered to digital services from June through September 2026, and the number of those recordings for which the uploader affirmatively acknowledged using AI. Perry Decl. ¶ 12.

The supplemental responses also disclosed, for the first time, that DistroKid has a second and far more significant means of identifying AI-generated content. In addition to the user-disclosure feature it introduced in April 2026, DistroKid stated that it "has access to a prediction model built by a third party, which assigns probabilities to content uploaded to DistroKid regarding the use or non-use of AI." Ex. C at 11. DistroKid characterized the results of this AI-detection tool as "estimates based on predictions, not determinations. Lower-probability results may include a significant number of false positives. The model does not identify content that was only partially created using AI." Ex. C at 11–12. DistroKid nonetheless refused to produce anything concerning the tool. It stated that it "will not produce data derived from the third-party prediction model, which reflects estimates rather than determinations and would be speculative and unreliable for the purposes for which it is sought," and that it "stands on its objections as to documents concerning the model's design, methodology, vendor, testing, results, and data." *Id.* at 12, 17.

**D. Plaintiffs' Narrowed Requests**

On October 12, Plaintiffs wrote to DistroKid confirming their understanding that the parties were at an impasse on the request concerning the AI-detection tool, and, to narrow the dispute as far as possible, proposed two narrowed requests to supersede Request Nos. 1 and 5 as served, stating that Plaintiffs would not seek to compel further production on the remaining requests at this time. Ex. G at 1. Plaintiffs drafted the narrowed requests to track DistroKid's own October 9 disclosure to be directed solely to the tool DistroKid identified and the results of that tool, in whatever form available to DistroKid. The narrowed requests are:

> **Narrowed Request No. 1:** Documents sufficient to show, by month, from the date DistroKid began using the third-party "prediction model" described in its October 9, 2026 Supplemental Response to the present: (1) the total number of recordings DistroKid delivered to digital services; (2) the number of those recordings DistroKid tested with the third-party prediction model; (3) the number of those recordings the prediction model scored as likely AI-generated, whether in whole or in part, in whatever probability levels or categories the model reports, or, if the model does not produce a "likely" or equivalent classification, the number of such recordings falling within each probability range the model reports (or, if the model reports a continuous score, within each

> decile); and (4) the total streams and royalties for the recordings in (3). If the prediction model identifies Suno as the actual or likely source of a recording, documents sufficient to show the number attributed to Suno.
>
> **Narrowed Request No. 5:** Documents sufficient to show (1) the name and vendor of the prediction model described in DistroKid's October 9, 2026 Supplemental Response and when DistroKid began using it; (2) whether the model identifies the actual or likely AI service that generated a recording, whether in whole or in part; and (3) any analysis or information DistroKid has of the model's accuracy or results, including the basis for the statements about false positives in DistroKid's October 9, 2026 Supplemental Response.[10]

*Id.* DistroKid did not accept this offer. This motion followed.

## III. LEGAL STANDARD

Subpoenas issued under Federal Rule of Civil Procedure 45 "are 'subject to the relevance requirement of Rule 26(b)(1)[.]" *Malibu Media, LLC v. Doe*, 2016 WL 5478433, at *2 (S.D.N.Y. Sept. 29, 2016) (citation omitted); *see also Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017) ("[T]he relevance standard that applies when seeking discovery from a party also applies to non-parties."). Rule 26(b)(1) permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1) "Relevance is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 564 (S.D.N.Y. 2024) (internal quotation marks omitted).

"The party seeking discovery bears the initial burden of proving the discovery is relevant," after which "the party withholding discovery on the grounds of burden, expense, privilege, or work

[10] As served, Request No. 1 sought "All Documents And Communications Relating To the prevalence or proliferation of Outputs generated using Any AI Service, including but not limited to Suno, that have been uploaded to, distributed by, or monetized through Your Distribution Service, broken down by AI Service." As served, Request No. 5 sought "Documents sufficient to show Your ability to identify Outputs uploaded to Your Distribution Service, including Any AI Detection Tool that You have used, tested, licensed, developed, or considered, and the results of any such use or testing." Ex. A, Attachment A at 4–5. DistroKid's objections and responses to those requests, including its General Objections, are set forth in Exhibit B, and its supplemental responses in Exhibit C. Plaintiffs address the objections DistroKid has asserted against the narrowed requests below.

product bears the burden of proving" that ground. *Citizens Union*, 269 F. Supp. 3d at 139; *see also DoorDash*, 754 F. Supp. 3d at 564–65. A party resisting a subpoena as unduly burdensome must support the claim with evidence, and "[t]he mere assertion that a subpoena is burdensome, without evidence to prove the claim, cannot form the basis for an 'undue burden' finding." *DoorDash*, 754 F. Supp. 3d at 579 (quoting *Samsung Elecs. Co. v. Microchip Tech. Inc.*, 2024 WL 3907250, at *9 (S.D.N.Y. Aug. 23, 2024)).

## IV. ARGUMENT

DistroKid has offered four reasons for refusing to produce anything about its AI-detection tool: (1) that the information is irrelevant to an action about how Suno trained its models; (2) that the tool's results are unreliable estimates generated by a third party; (3) that the information is confidential; and (4) that production would be burdensome. None withstands scrutiny. The narrowed requests go to the heart of Suno's fair use defense. The tool's efficacy, at most, bears on the weight of the evidence, not its discoverability, and DistroKid has the ability to obtain the requested information concerning its own use of the AI-detection tool. The Protective Order resolves any legitimate confidentiality concerns. And DistroKid's remaining objections, which were directed at the Subpoena as served, do not survive the narrowing.

### A. The Narrowed Requests Seek Information Directly Relevant to Suno's Fair Use Defense

#### *1. The Market Effect of AI-Generated Outputs Is Central to the Fourth Fair Use Factor*

Suno's fair use defense turns on the four statutory factors, the fourth of which is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The Supreme Court has explained that this factor is "undoubtedly the single most important element of fair use." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). The fourth factor "focuses on actual or potential market substitution," *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 536 n.12 (2023), and the inquiry is trained on "whether the copy brings to the marketplace a competing substitute for the original, or its

derivative, so as to deprive the rights holder of significant revenues[.]" *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024). The inquiry is not confined to the defendant's own conduct in isolation. Courts must consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (internal quotation marks omitted); *see also Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, No. 25-2153, 2026 WL 2932557, at *9 (3d Cir. Sept. 29, 2026) (applying *Campbell's* "unrestricted and widespread" standard to copying for AI training).

In the generative AI context, courts have recognized that the fourth factor encompasses precisely the harm Plaintiffs allege here: the flooding of the market with machine-generated works that compete with the originals on which the model was trained. In *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025), the court explained that a generative model "might harm the market for [copyrighted] works . . . by helping to enable the rapid generation of countless works that compete with the originals, even if those works aren't themselves infringing." *Id.* at 1052. Because generative AI "can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on," "[n]o other use . . . has anything near the potential to flood the market with competing works," and "the concept of market dilution becomes highly relevant." *Id.* at 1055. The court predicted that "market dilution will often cause plaintiffs to decisively win the fourth factor—and thus win the fair use question overall—in cases like this." *Id.* The plaintiffs in *Kadrey* nonetheless lost, because they "presented no meaningful evidence on market dilution at all" and offered "no empirical evidence" of harm, only "speculation." *Id.* at 1056, 1060. The Copyright Office has reached the same conclusion. After a multi-year study of generative AI and copyright, the Office rejected the argument that the fourth factor "considers only harm to markets for the specific copyrighted work," explaining that "[t]he statute on its face encompasses any 'effect' upon the potential market." U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* at 64–65 (pre-publication version May 2025) ("USCO Report"). More specifically, the Copyright Office

observed that "[t]he speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data."[11] That is the theory Plaintiffs have pleaded from the outset, and the market impact of Suno's outputs is among the most contested factual questions in the underlying action. That is the theory Plaintiffs have pleaded from the outset, and the market impact of Suno's outputs is among the most contested factual questions in the underlying action.

*2. DistroKid's AI-Detection Data is Direct Evidence of Market Impact*

The narrowed requests seek the evidence of market dilution that *Kadrey* demands, from an entity that is singularly positioned to supply it. Narrowed Request No. 1 asks for monthly counts of the recordings DistroKid delivered to digital services, the number it tested with its AI-detection tool, and the number the tool scored as likely AI-generated, together with the streams and royalties those recordings earned. Each component maps onto an element of the fourth-factor inquiry. The counts measure the volume of AI-generated recordings entering the streaming market through its largest single channel, month over month, which is the "flood" itself. The streams measure the extent to which listeners are in fact consuming those recordings in place of human-created ones, which bears on substitutability. And the royalties measure the revenue those recordings have drawn from the pools that would otherwise be paid to Plaintiffs and other rightsholders for human-created works, which are the "significant revenues" of which rightsholders are being deprived as relevant to the fourth factor analysis. *Hachette Book Grp.*, 115 F.4th at 189. Because DistroKid remits royalties to its uploaders, it necessarily possesses stream and royalty data for every recording it distributes. *See supra* n.2.

DistroKid's position in the supply chain makes its data uniquely probative. DistroKid sits upstream of every major streaming service and delivers to all of them, so its detection results capture AI-generated recordings at the point of entry and across the market. It distributes roughly 40% of all new music, Ingham *supra* n. 3 and, on the publicly available evidence, roughly three-

[11] The Copyright Office cited the allegations in this very case as its illustration of the harm, quoting the complaint's allegation that Suno's outputs were "finding their way onto the major streaming services . . . compet[ing] with the copyrighted sound recordings that enabled their creation." USCO Report at 65 n.375.

quarters of the AI-generated music that reaches the services, Exs. D & E. Suno, for its part, does not track where its outputs are distributed and disclaims any independent knowledge of the platforms to which its users upload them. And DistroKid has conceded that it already runs its catalog through a tool that "assigns probabilities to content uploaded to DistroKid regarding the use or non-use of AI." Ex. C at 11. The data Plaintiffs seek is therefore already in DistroKid's possession, in the aggregate form Plaintiffs have requested.

Narrowed Request No. 5 is relevant for largely the same reasons. The vendor of the third-party AI-detection tool, when DistroKid began to use it, and whether it attributes recordings to a particular generative service are the minimum facts needed to interpret the data produced under Request No. 1, including whether any of it can be tied to Suno specifically. Information concerning the tool's accuracy is also relevant to interpreting the results. Indeed, the issuing court has already deemed reports pertaining to the accuracy and efficacy of other AI tools to be an appropriate subject of discovery. When Suno sought the Recording Industry Association of America's ("RIAA") testing reports on the accuracy of third-party AI-detection tools, Chief Magistrate Judge Levenson, who is presiding over discovery in the underlying action, ordered them produced over Plaintiffs' objection, reasoning that whether a tool's "error rate [is] three percent" or "40 percent" is something "both sides will argue" about and that such material "falls broadly within the ambit of the very broad contours of relevance under Rule 26 and, more specifically, . . . impact on market." Ex. H at 11:24–12:20. What DistroKid knows about the accuracy of the tool it has actually deployed over portions of its distributed catalog is, if anything, more probative than the RIAA's testing of tools not yet in use.

*3. DistroKid's Relevance Objections Mischaracterize the Underlying Action*

DistroKid's refusal to produce the requested information rests on the premise that the underlying action concerns only how Suno "built and trained its artificial-intelligence models," so that information about AI-generated content on DistroKid's platform "has no bearing on whether Suno copied Plaintiffs' recordings to train its models or circumvented YouTube's technological measures[.]" Ex. C at 1, 11. That describes the factual basis for Plaintiffs' infringement claims but

ignores Suno's principal defense. Rule 26(b)(1) extends to matters relevant to "any party's claim or defense," and fair use is the defense on which Suno has staked the case. Taken to its logical extreme, DistroKid's framing would mean that no discovery bearing on the fourth factor is available from any non-party—a proposition no court has accepted.

DistroKid relies on paragraph 53 of the First Amended Complaint to establish its unduly narrow conception of the issues presented in this litigation. Ex. C at 1–2, 3, 14. In that paragraph Plaintiffs state that they are "not presently alleging that [the illustrative soundalike] outputs [referenced in the complaint] themselves infringe the Copyrighted Recordings[.]" First Am. Compl. ¶ 53. Whether Suno's outputs are independently infringing is a different question from whether they harm the market for or value of Plaintiffs' recordings. As discussed above, the fourth factor asks about "the effect of the use upon the potential market or value of the copyrighted work," 17 U.S.C. § 107(4), and the "use" at issue is Suno's copying of Plaintiffs' recordings to build a service whose commercial purpose is to generate competing recordings. *Kadrey* makes the point expressly: market dilution is harm from "countless works that compete with the originals, even if those works aren't themselves infringing." 788 F. Supp. 3d at 1052. Plaintiffs pleaded exactly that harm throughout the operative complaint. *See, e.g.*, First Am. Compl. ¶¶ 4, 74, 78–80.

Nor can DistroKid withhold the requested information because the narrowed requests might reach information relevant to multiple AI models. Ex. C at 2–3, 10–11. DistroKid has not said whether its AI-detection tool attributes recordings to a particular generative service. That is why Narrowed Request No. 5(2) asks that question, and Narrowed Request No. 1 seeks Suno-specific figures only "[i]f the prediction model identifies Suno as the actual or likely source." Regardless, whether the tool attributes by source is of no moment for factor four purposes, because that factor asks what "unrestricted and widespread conduct of the sort engaged in by the defendant" would do to the market. *Campbell*, 510 U.S. at 590. Conduct "of the sort" Suno engages in is the generation of digital audio recordings by infringing AI models. The distinction is also unlikely to matter much in practice, because the available public data on the question indicates that Suno dominates the production of AI-generated music reaching the streaming services, having been used

for more than ninety percent of the tracks submitted to the leading AI music charts in each of the first two reporting periods of 2026. *See* Exs. D & E.

**B. The Probabilistic Nature and Third-Party Origins of DistroKid's AI-Generation Tool Are Not Grounds to Withhold the Results**

DistroKid's stated reasons for refusing to produce anything about its AI-detection tool are that its results are "estimates rather than determinations" that "would be speculative and unreliable," and that the tool "was built and is maintained by a third party" whose "design and methodology are not within DistroKid's control." Ex. C at 12, 17. Neither withstands scrutiny.

The reliability objection presumes facts that Plaintiffs are entitled to test in discovery and, in any event, confuses admissibility with discoverability. Information "need not be admissible in evidence to be discoverable," Fed. R. Civ. P. 26(b)(1), and concerns about the reliability of data "primarily concern[] the weight of that evidence," to be contested "in a motion in limine or before a fact-finder." *Max Impact, LLC v. Sherwood Grp., Inc.*, 2014 WL 902649, at *11 (S.D.N.Y. Mar. 7, 2014). The issuing court has already applied that principle to AI-detection technology in this case. *See* Ex. H at 11:24–12:20. Detection tools commonly produce probabilistic classifications—indeed, that is how most AI detection tools function. Narrowed Request No. 1 accounts for that by asking for counts "in whatever probability levels or categories the model reports." It does not ask DistroKid to decide which recordings are AI-generated or to "form and disclose subjective judgments" about them. Ex. C at 8. Plaintiffs simply request that DistroKid provide information in the form its AI-detection tool provides.

The third-party objection does not respond to the narrowed requests, which seek neither the tool's design nor its methodology. A company that licenses a detection tool and runs its own distributed catalog through it possesses the detection results, irrespective of who built the tool. The basic facts sought by Narrowed Request No. 5 are necessarily within DistroKid's knowledge, as its own description of the tool confirms. *Id.* To the extent any data resides with the vendor, a subpoena reaches materials the recipient has "the right, authority, or practical ability to obtain[.]" *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (finding control where the party

could simply "call [the non-party] and ask" for documents and "they'd send it"); *see also Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 147 (S.D.N.Y. 2011) ("[F]or the purposes of a Rule 45 subpoena, a document is within a witness's 'possession, custody, or control' if the witness has the practical ability to obtain the document."). DistroKid "has access to" the tool, Ex. C at 11, and has not suggested it cannot obtain its own results.

**C. The Protective Order Addresses DistroKid's Confidentiality Concerns**

DistroKid objects that the requested information is confidential and that its disclosure to Plaintiffs, whose affiliates operate competing distribution businesses, would cause competitive harm "that no protective order can fully cure." Ex. C at 5–6. It also objects that disclosing the vendor's identity or the tool's results would provide "a roadmap for evasion" and would implicate confidentiality obligations to the vendor. *Id.* at 6–7, 16. These objections do not justify withholding production, particularly given the protective order in place.

Rule 45(d)(3)(B)(i) permits, but does not require, a court to quash a subpoena seeking confidential commercial information, and a "conclusory assertion" that a subpoena seeks "private, confidential, and commercially sensitive" material does not suffice. *Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 57892, at *6 (S.D.N.Y. Jan. 4, 2013). Courts in this District routinely hold that a protective order permitting non-party designations addresses such concerns. *See, e.g.*, *BLST Northstar, LLC v. Atalaya Cap. Mgmt. LP*, 2024 WL 2279195, at *7 (S.D.N.Y. Mar. 12, 2024) (non-party's competitive-harm concerns "can be addressed in large measure by the Protective Order . . . and restriction of the material to outside counsel eyes only"). That is the case here.

The Amended Protective Order in the underlying action extends to "all third parties providing discovery in this action," and creates a Highly Confidential–Outside Counsel Only tier specifically for "sensitive data received from a non-party," which may be invoked "at the request of that non-party for the purpose of facilitating the production of materials that are subject to a legal obligation of confidentiality (whether contractual, statutory, regulatory, or otherwise) owed to that non-party." Underlying Action, Dkt. 180 ¶ 6. Material so designated may be seen only by

outside counsel of record, experts bound by a non-disclosure agreement and subject to advance notice and objection, and the Court. *Id.* ¶¶ 15, 17. It may be used "solely for the prosecution or defense of this action and not for any other purpose," and "may not [be] use[d] . . . for any business, commercial, or competitive purpose." *Id.* ¶¶ 1, 20. DistroKid's objection that it "has not agreed to be bound by" the Protective Order, Ex. C at 6, is also difficult to square with the fact that DistroKid has already designated its October 9 production "Highly Confidential – Outside Counsel Only" under the Protective Order. *Id.* at 25.

The protective order disposes of each concern DistroKid raises. Plaintiffs' in-house personnel and their distribution affiliates will not see the material. The "roadmap for evasion" objection is misdirected at requests that seek aggregate counts, a vendor's name, and DistroKid's own knowledge of the tool's accuracy rather than the tool's methodology or thresholds. In any event an Outside Counsel Only designation forecloses any path by which those outside the protective order's scope could learn anything. And to the extent DistroKid suggests the Subpoena is a vehicle for obtaining discovery for use in UMG's separate action against DistroKid in Delaware, Ex. C at 2, the Protective Order's use restriction forecloses that risk—nothing produced in this action may be used in that separate legal proceeding.

**D. DistroKid's Remaining Objections Lack Merit**

DistroKid's remaining objections are directed at the Subpoena as served and do not survive the narrowing.

*Burden and proportionality.* DistroKid asserts that compliance would be unduly burdensome, Ex. C at 4, but has offered no evidence of burden at all. "The mere assertion that a subpoena is burdensome, without evidence to prove the claim, cannot form the basis for an 'undue burden' finding." *DoorDash*, 754 F. Supp. 3d at 579 (internal quotation marks omitted). The burden objection was in any event framed against the subpoena as-served, which has been substantially narrowed in this motion. What remains at issue are two requests for documents "sufficient to show" aggregate figures from a single tool over the period DistroKid has used it, and a handful of basic facts about that tool. Weighed against the importance of the information to the



10073969

central contested issue in the underlying action and the absence of any alternative source, the requests are proportional by any measure.

*Compilation.* DistroKid objects that the Subpoena would require it to create "compilations, analyses, or reports that it does not maintain in the ordinary course of business." Ex. C at 7. But "simply searching a database and providing the results therefrom in a report does not require creation of a new document beyond the scope of" the Federal Rules. *Local 3621, EMS Officers Union v. City of New York*, 2024 WL 1856302, at *2 (S.D.N.Y. Apr. 26, 2024) (internal quotation marks omitted). Courts "regularly require parties to produce reports from dynamic databases, holding that the technical burden . . . of creating a new dataset for litigation does not excuse production." *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 51 (E.D.N.Y. 2018) (internal quotation marks omitted). Monthly counts of recordings delivered, tested, and scored, and the streams and royalties associated with them, are query results from data DistroKid maintains in the ordinary course of its business.

*Alternative sources.* DistroKid suggests that the requested information is available from Suno or the digital services. Ex. C at 4. It is not. Suno says it lacks independent knowledge of where its outputs are distributed, and no streaming service possesses DistroKid's detection results or its delivery, stream, and royalty data across all services. And DistroKid is the only source for what DistroKid's tool reported to it regarding its distributed catalog.

## V. CONCLUSION

DistroKid is a primary conduit of AI-generated music onto major streaming services where Plaintiffs' copyrighted sound recordings are available for consumption. And DistroKid has admitted that it measures that flow with an AI-detection tool. Whether that flow is harming the market for Plaintiffs' recordings is a question at the center of Suno's fair use defense. Plaintiffs ask for two things: the aggregate results of DistroKid's tool, and the basic facts needed to understand them. Those results are DistroKid's own records and may be produced under an Outside Counsel Only designation that DistroKid has already invoked. Nothing in Rule 45 permits a non-party to withhold relevant, proportional information because it regards the data as imprecise

or its source as inconvenient. The Court should grant the motion and order DistroKid to produce documents responsive to Narrowed Request Nos. 1 and 5.

Dated: New York, New York
October 14, 2026

By: ______________________________
Moez M. Kaba
Mariah N. Rivera
Alexander R. Perry
**HUESTON HENNIGAN LLP**
1 Little W 12th Street, 2nd Floor
New York, NY 10014
Telephone: (646) 930-4046
Facsimile: (888) 866-4825
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Rajan S. Trehan*
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4381
Facsimile: (888) 866-4825
rtrehan@hueston.com

Christina V. Rayburn*
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 356-6412
Facsimile: (888) 866-4825
crayburn@hueston.com

*Counsel for Plaintiffs*
**Pending admission pro hac vice*

**CERTIFICATATION OF COMPLIANCE**

As required by Local Civil Rule 7.1(c), I hereby certify that the foregoing Memorandum of Law contains 6,525 words, excluding the parts of the Memorandum that are exempted from Local Civil Rule 7.1(c).

*/s/ Moez M. Kaba*
Moez M. Kaba